**Richard Thomas BOGGS, Petitioner,**

v.

**Toni V. BAIR, Warden, Mecklenburg Correctional Center; Edward Murray, Director, Virginia Department of Corrections; and Mary Sue Terry, Attorney General of Virginia, Respondents.**

Civ. A. No. 88-0360-R.

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 26, 1988.

Bruce R. Genderson, Jefferson M. Gray, Washington, D.C., Mark S. Levinstein, Falls Church, Va., for petitioner.

Robert H. Anderson, III, Associate Atty. Gen., Richmond, Va., for respondents.

## OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on the respondent's motion to dismiss a federal habeas corpus petition filed by Richard

Boggs on May 26, 1988, and Boggs' cross-motion for summary judgment. The Court finds no merit in any of Boggs' contentions except his assertion that portions of his confession should have been redacted before it was admitted into evidence. Thus, for the reasons stated in this opinion, the Court GRANTS respondent's motion to dismiss as to all claims except the redaction of the confession, GRANTS petitioner's cross-motion as to that issue, and REMANDS the case to the Portsmouth Circuit Court for a new sentencing proceeding.

I

In the early evening of January 25, 1984, Treeby Shaw, an 87-year-old widow, was murdered in her Portsmouth home. The medical examiner reported that she was beaten on the head several times with a blunt object, and then stabbed with a kitchen knife found beside the body. There was only one stab wound, but the knife had been partially withdrawn and rethrust three times. One thrust penetrated some eleven inches and pierced the wall of Shaw's heart to cause her death. There were also injuries to her neck, skull, ear and ribs. Silver candlesticks, rings and silver flatware were missing from the home.

Within a week, police began to suspect Boggs, a neighbor of Mrs. Shaw, on a tip that he had been trying to sell silver that matched the description of Shaw's missing items. In the early morning hours of February 17, 1984, Boggs, who is white, was arrested by the Portsmouth police for the hit-and-run death of a black pedestrian earlier that night. He was also charged with driving under the influence. Despite testimony from several police officers that over the next few hours Boggs did not seem drunk, a breathalyzer test registered a blood alcohol level of .22 at 2:10 a.m. Boggs has a long history of drug and alcohol abuse, and later testified that he had consumed a six pack of beer, most of a fifth of whiskey, amphetamines and marijuana since 9:00 p.m. that night.

Boggs and his car were taken to the station, and when questioned Boggs said he knew nothing about the Shaw murder. Meanwhile, police conducted what they alleged was a routine warrantless inventory search of Boggs' car, which Boggs now claims was a pretext for an investigatory search. In the car the officer found a blue knapsack that contained silver candlesticks and flatware engraved "Treeby" and "Shaw."

The search was completed at 6:25 a.m., and officers told Boggs they had evidence linking him to the Shaw murder and that he was a suspect in the crime. They gave him *Miranda* warnings, after which he signed a written waiver and made a statement that was transcribed and that he signed at 7:10 a.m. In the confession, Boggs stated that he had gone to Shaw's home at 7 p.m. the night of the murder, on the pretext of borrowing a book, intending to kill her and take valuables to support his drug habit. He had tea with Shaw for approximately an hour, and then hit her repeatedly with a four-inch "hunk of steel." Shaw fell to the floor at the first blow. Because she was unconscious but still breathing, Boggs said in his confession, he took a butcher knife from the kitchen and stabbed her. In the confession he also stated: "I want to kill the enemy on the other side, which is me, the white all over the world. I want to kill niggers."

At a suppression hearing, Boggs' counsel moved to suppress the items taken from the knapsack and exclude the confession as fruit of an illegal search. Counsel also requested the court to redact the "I want to kill niggers" sentence as irrelevant since both Boggs and Shaw were caucasian. The court denied all motions.

During these proceedings, the case received some newspaper publicity. The articles contain portions of Boggs' confession and convey the impression that Shaw was a well-liked member of the neighborhood and that no one could believe Boggs, an "average" neighbor, had killed her. Newspapers also covered Boggs' trial and conviction in the hit-and-run case, which was completed shortly before the murder trial began.

A jury was empaneled from a venire of 36. Though 18 had heard of the case, all

stated they could lay aside any impressions they had and judge the case on the evidence presented. Three jurors were dismissed for cause when they stated their opposition to the death penalty. They said that under no circumstances could they impose the penalty, though they were not asked whether they could set those convictions aside and follow the law. Boggs now challenges that decision as a denial of the right to a jury selected from a fair cross-section of the community. Boggs also challenges the trial judge's refusal to exclude four other jurors, three of whom thought the defendant had the burden of proof and one who thought the biblical "eye for an eye" maxim required that death be imposed for most murders. All four said they could lay these opinions aside and follow the judge's instructions.

Boggs was convicted and the same jury heard evidence on sentencing. Prosecution witnesses in the penalty phase testified about Shaw's injuries. The defense presented a psychiatrist, Boggs' father, and Boggs himself. The jury recommended death, and after the required presentence hearing the judge adopted the jury's recommendation. The conviction and sentence were affirmed by the Supreme Court of Virginia. *Boggs v. Commonwealth*, 229 Va. 501, 331 S.E.2d 407 (1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 347 *reh'g denied*, 475 U.S. 1133, 106 S.Ct. 1666, 90 L.Ed.2d 207 (1986).

Boggs then brought a habeas petition in Portsmouth Circuit Court. The Court dismissed the petition in a memorandum order that did not discuss any of the issues but merely adopted the arguments of the state in its opposition brief. The Supreme Court of Virginia likewise rejected Boggs' habeas appeal in a summary order, and the Supreme Court denied certiorari. *Boggs v. Bair*, —— U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988).

## II

### 1. Fourth Amendment claims

Arguing that the search of his car and knapsack was investigatory and not a routine inventory, Boggs claims that probable cause was lacking and that the silver and his confession should be suppressed as fruit of an illegal search.

■ Ordinarily, fourth amendment claims may not be relitigated on federal habeas, *see Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), but Boggs argues that *Stone* is inapplicable because he did not receive a full and fair hearing on the merits. *See id.* at 482, 96 S.Ct. at 3046. Specifically, Boggs points to the Supreme Court's decision in *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), decided after direct appeal and before state habeas, as a changed circumstance that requires a new hearing. The Court finds no merit in this claim.

In *Bertine*, the Supreme Court upheld 7–2 the validity of an inventory search like the one here. Bertine was arrested for drunk driving, and the search uncovered narcotics. In a concurring opinion, joined by two other Justices, Justice Blackmun emphasized that he voted with the plurality only because standardized inventory procedures in the case limited the officers' discretion and suggested that the search had not been a mere pretext. Boggs argues that the state has the burden of justifying its warrantless search, *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970), and the state here presented no evidence that standardized procedures exist or were followed.

■ However, the state apparently met its burden of proof, for the trial court and the Virginia Supreme Court on direct appeal found that the search was conducted according to routine procedure. *Boggs v. Commonwealth*, 221 Va. 501, 331 S.E.2d 407, 414 (1985). Under 28 U.S.C. § 2254(d), these factual findings are entitled to deference, and the Court may not grant an evidentiary hearing on the existence of standardized procedures unless Boggs can show that the state courts' finding was contrary to the evidence or that the state courts did not adequately develop the facts.

Boggs argues only that the police suspected him of the murder before the search, but this mere circumstance does not justify a redetermination of the factual issue. Even if the police were hopeful that they would uncover evidence, that fact alone does not suggest that they violated established procedure when they inventoried the contents of Boggs' car.

Boggs further argues that the state court did not sufficiently develop the facts, because the Supreme Court's emphasis on standardized procedures in *Bertine* would have prompted him to litigate the issue more fully in the trial court. But Justice Blackmun's concurrence did not fundamentally change the law of inventory searches; Boggs could have pressed this claim under existing law at the time of trial. *See, e.g., Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). He therefore had an opportunity to litigate his claim, and that is all that *Stone* requires. *See Doleman v. Muncy,* 579 F.2d 1258 (4th Cir.1978).

### 2. Fifth Amendment Claim

Boggs next claims that his confession should not have been introduced because he was drunk when he signed it and its use therefore violated his privilege against self-incrimination. Boggs requests an evidentiary hearing on how intoxicated he was, and provides (as he did in the state habeas proceedings) expert medical testimony that if Boggs registered .22 at 2:10 a.m., he would still have been well over the legal limit when he signed his confession.

■ As an initial matter, the respondent claims that Boggs has defaulted his right to present expert testimony by failing to do so in the trial court. However, the Court finds that Boggs is not barred because the doctrine of procedural default bars *claims* that have not been raised, not evidence on claims that were preserved. *See Garret v. Morris,* 815 F.2d 509, 512 n.

3 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987); *Francis v. Spraggins,* 720 F.2d 1190 (11th Cir.1983), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985). Boggs has litigated the *issue* of intoxication throughout this appeal, and he may present new arguments and evidence on that preserved claim.

■ On the merits, the voluntariness of a confession is a legal issue to be decided by the reviewing court. *Miller v. Fenton,* 474 U.S. 104, 115–118, 106 S.Ct. 445, 452–454, 88 L.Ed.2d 405 (1985). However, state court findings of fact surrounding the voluntariness issue are entitled to deference under § 2254(d). *U.S. v. Locklear,* 829 F.2d 1314, 1317 (4th Cir.1987); *U.S. v. Lewis,* 528 F.2d 312, 313 (4th Cir.1975). The Court may therefore review the voluntariness issue but must accept the state courts' finding that Boggs was not intoxicated unless against the weight of the evidence.

■ The only issue, then, is whether the court should hold an evidentiary hearing to redetermine whether Boggs was too intoxicated to understand that he was confessing to murder. Under § 2254(d), district courts may review a factual finding if, *inter alia,* "the Federal court ... concludes that such factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8). Boggs has a persuasive case on the facts. The respondent presents only the subjective impressions of the interrogating officers, hardly disinterested witnesses, that Boggs did not seem drunk when they elicited his confession.[1] The only available *objective* evidence, the breathalyzer, showed Boggs to be in a virtual stupor at 2:10 a.m. Boggs also presents the expert testimony that he still would have been drunk at 7:10, and his own testimony that he had also taken drugs that night.

Nevertheless, the Court declines to hold a hearing, because even if Boggs could establish that he was still drunk, the law requires more coercion than mere intoxi-

---

1. In fact, even the police officers' testimony is not uncontradicted. The officer administering the breathalyzer test testified that Boggs was groggy and slept most of the time she observed him.

cation to render a confession involuntary. *Washington v. Downes*, 475 F.Supp. 573 (E.D.Va.1979), *overruled on other grounds, Carrier v. Hutto*, 724 F.2d 396, 403 (4th Cir.1983). In *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1987), the Supreme Court upheld the conviction of a defendant who confessed to a street policeman at the instruction of the "voice of God." The Court held the confession voluntary because the compulsion to confess was not accompanied by "coercive police activity." It is true, as Boggs argues here, that unlike Connelly he was in police custody when he confessed. But he does not allege that he was forced to speak or mistreated in any way, and merely being held by the police does not constitute sufficient "coercive police activity" to invalidate his confession. *Cf. Downes*, 475 F.Supp. 573. Because Boggs has alleged no more than the defendant in *Downes*, this claim is dismissed.

### 3. Refusal to redact racial epithets from confession

■ Next, Boggs argues that the trial court should have removed two sentences from his confession: "I want to kill the enemy on the other side, which is me, the white all over the world. I want to kill niggers." Boggs claims that because both he and the victim are white, the remark was irrelevant to his trial and its inclusion prejudiced the jury in violation of the eighth amendment and due process.

Again, the respondent insists that most of this claim is defaulted: Boggs objected only to the latter sentence at trial, and objected to it only in the guilt phase. As with the expert testimony *supra*, since the claim was properly preserved, the additional attack on the preceding sentence is not barred. Moreover, defense counsel mentioned both sentences in his objection at trial, has referred to "portions" of the confession throughout, and renewed all guilt phase motions at the beginning of the sentencing phase. The respondent also overlooks the fact that the same jury convicted and sentenced Boggs, and any prejudice in the guilt phase necessarily infected Boggs' sentencing as well.

■ The respondent next argues that this claim involves no more than a state evidentiary ruling that cannot be reviewed on federal habeas. This contention is utterly without merit. It is well established, in the very cases respondent cites, that evidentiary rulings challenged on constitutional grounds are always reviewable. *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2652, 33 L.Ed.2d 706 (1972); *Inge v. Procunier*, 758 F.2d 1010 (4th Cir.1985); *Chance v. Garrison*, 537 F.2d 1212 (4th Cir.1976).

■ On the merits, the respondent conceded in his reply brief and twice on oral argument that the statements were not probative of any relevant issue during the guilt phase. Response in Opposition to Cross-Motion, p. 25. The fact that Boggs showed himself to be a racist is no more relevant to the question of whether he committed murder than if he had declared himself a communist, a homosexual, or an adulterer—all characteristics that might well affect the jury's evaluation of Boggs' character, but which could not be at all helpful in determining his guilt.

The statement was equally irrelevant in the sentencing phase. The jury was instructed on only one component of one of Virginia's aggravating circumstances: that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved ... an aggravated battery to the victim." Va.Code § 19.2–264.2 (1977). The jury was only instructed to determine whether Boggs' physical act of murder warranted a moral judgment that he should receive the death penalty. Boggs' racial views have no bearing on the culpability of this particular act. The respondent insists that the statement demonstrates the "vileness" of Boggs' character more broadly, but general evidence of Boggs' character simply does not come within the narrow confines of the jury's instruction. Their only decision was whether the circumstances of the physical attack warranted a finding that that murder was vile, not whether Boggs should receive the death penalty because he was a racist. The Court holds *infra* p. 873 that the instruction properly focused the jury's

deliberation on the moral culpability of the murder rather than a factual analysis of Shaw's wounds and cause of death. But the fact that the jury had a moral judgment to make about the culpability of Boggs' *act* does not mean they had a right to consider other elements of his character that have no bearing on this particular act of murder.

The Supreme Court has clearly stated that sentencing juries may consider only evidence relevant to the offender's culpability for the particular offense. *See, e.g., Booth v. Maryland,* — U.S. —, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (evidence considered must have "some bearing on the defendant's 'personal responsibility and moral guilt'" for the crime charged); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (consider only *"relevant* facets of the character and record of the individual offender or the circumstances of the particular offense") (emphasis added). Indeed, the Supreme Court struck the death penalty nationwide in 1972 because the standards then applied did not guarantee that juries would impose the penalty based on evidence that *this* offender deserved the penalty for *this* crime. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). To permit juries to impose death sentences based on a defendant's opinions, be they racist, anti–Semitic, or otherwise offensive, contradicts the rationale that underlies sixteen years of Supreme Court jurisprudence. *See, e.g., id.* at 255, 92 S.Ct. at 2734 (Douglas, J., concurring) (eighth amendment forbids imposition of the death penalty because a defendant is "a member of a suspect or unpopular minority"). The Court finds that inclusion of these irrelevant comments violated Boggs' rights under the eighth and fourteenth amendments.

Having conceded the irrelevance of the statements, the respondent attempts to defend their retention as harmless error: given the rest of the confession (including Boggs' unchallenged statement that "I am a cold-blooded killer") and the fact that both Boggs and the victim were white, the one statement probably did not affect the jury's verdict. To prevail on this argument, the respondent must prove beyond a reasonable doubt that the error was harmless. *Satterwhite v. Texas,* — U.S. —, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

█ As to the guilt phase, the respondent has satisfied this test. The rest of the confession was not challenged, and the evidence of guilt was therefore so overwhelming as to render any prejudice in the guilt phase harmless. Indeed, Boggs' counsel conceded as much on oral argument. The respondent has not proven, however, that the error was harmless in the penalty phase. The confession was available in the jury room during both guilt and sentencing deliberations, and though the respondent hastens to point out that the victim was white, several jurors were black. More importantly, the prosecutor must not have considered the two sentences "harmless," for he emphasized them in both phases. During the guilt trial, the prosecutor argued that those two sentences, which the respondent now dismisses, warranted a verdict of capital murder instead of first degree:

> "we are going to decide that this defendant ... is guilty of capital murder, because when you look at this statement, ... you ask yourselves, 'What type of individual would say words like this?' ... It's in there, [he] calls them a name; it's in here, and you know what the name is, and he tells you to give him first degree murder, so you won't have to come back [for a sentencing phase]."

In the sentencing phase, the prosecutor returned to this theme, urging that anyone with such racist views deserved to die: "he said, 'I want to kill the enemy on the other side'; yet, they will tell you to spare his life.... He goes on to say, 'I want to kill niggers'; and he said today it's true; so he's not going to confine himself to any particular people." This latter argument might have been relevant had the jury been charged on the aggravating circumstance dealing with future dangerousness, but they were not. The refusal to redact these statements could only have been preju-

dicial, and the respondent has failed to prove they were not.

The respondent places great weight on *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), but *Darden* is irrelevant to this issue. That case set out the very high burden that a defendant must bear in demonstrating that prosecutorial comments deprived him of a fair trial. But there is no contention here that the prosecutor acted improperly; once the trial judge admitted the entire confession, the prosecutor was only emphasizing the admitted evidence that he thought most helpful to his case. Boggs attacks the trial judge's ruling, not the prosecutor's comment. Though the prosecutor may have been the immediate cause of the prejudice, the constitutional error was the judge's refusal to redact the sentences from the confession. Because the error was harmless in the guilt phase, Boggs' conviction stands, but the case is remanded to state court for a new sentencing phase with an edited confession.

### 4. Pretrial publicity

■ In the seven months between the murder and Boggs' murder trial, articles about the murder appeared roughly once a month in local newspapers. The articles describe the victim as well-liked in the community, and the surprise of neighbors when Boggs was charged. Articles closer to the trial described Boggs' confession and reported his conviction for murder in the hit-and-run incident. Boggs moved for a change of venue or venire because of this publicity, and now argues he was denied a fair trial.

The Court dismisses this claim for two reasons. First, Boggs has not demonstrated the level of publicity that the Supreme Court has required for a finding that the right to a fair trial was violated. Seven articles in seven months simply does not compare with the facts of *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), or *Irvin*

*v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Though these cases all reversed convictions because of publicity, "[t]hey cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). Indeed, the defendant in *Murphy* had been exposed to national as well as local publicity, and the record there contained "scores" of articles about the defendant and the incident. Boggs simply has not demonstrated that the community was so poisoned with publicity that he was denied due process.

Second, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643. All of the jurors who ultimately sat on Boggs' jury said that they could lay aside whatever they had heard about the case, and the judge repeatedly asked them throughout the trial about their exposure to publicity. Boggs has made no showing that the jurors were biased by pretrial information, *see Wansley v. Slayton,* 487 F.2d 90, 92 n. 8 (4th Cir.1973), and to grant a new trial for seven news articles would mean that no defendant could be tried in the community where the crime allegedly occurred.

### 5. Exclusion of Jurors

■ Three members of the venire were excluded for cause when they expressed their opposition to the death penalty. All three stated that under no circumstances could they impose death, but were not asked whether they could set those views aside and follow the law. Boggs claims that this exclusion denied Boggs his sixth and fourteenth amendment right to an impartial jury, but the Court finds no merit in this argument.

The standard for exclusion of jurors was settled in *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841

(1985): the question is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' " (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Although the trial court failed to determine by a precise question whether the three jurors could set aside their personal views, the three made sufficiently clear that they would be unable to judge the case impartially. When each was asked "Are there any circumstances which would enable you to vote for the death penalty?", the three responded "None at all; I'm just plain against it"; "No; I'm against the death penalty"; and "For the death penalty, I don't think I would be able to do that." No precise formulation of the questions is required, and the Court believes the trial court's application of the *Witt* standard was well within the bounds of deference reviewing courts owe such findings under 28 U.S.C. § 2254(d). *See Witt*, 469 U.S. at 427–29, 105 S.Ct. at 854–55.

The Supreme Court did reverse a death sentence in *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), when the judge excluded for cause a juror who hesitated in affirming her ability to impose the death penalty. But the juror in *Gray* had admitted that she could impose the death penalty in the proper case, and *Gray* never reached the issue of whether more exacting voir dire on the ability to set aside personal views was required. All of the jurors stricken here said, in one form or another, that they were unequivocally opposed to the death penalty and could not think of any circumstances in which they would vote to impose it.

### 6. *Refusal to strike jurors*

■ Three other jurors, when initially questioned, said they thought Boggs had the burden of proving his innocence, even though all three had served as jurors in a criminal trial just a week before. A fourth juror quoted the biblical maxim of "an eye

for an eye" and said she thought death was "ordinarily" the appropriate punishment for murder. Despite defense challenges for cause, all four were seated.

Rather than standing unequivocally on these positions like the three excluded jurors, however, these four expressed more confusion than certainty. After further voir dire from the judge, the first three swore they could abide by the judge's instruction that the defendant carried no burden of proof, and the fourth said she could vote for life imprisonment if she thought it appropriate. These affirmations clearly satisfy the standard set forth in *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984): the partiality of a juror is "plainly [a question] of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed." Particularly when viewed through the deferential lenses imposed by § 2254(d), the Court concludes that the trial court's credibility judgment should not be overturned, and this claim is dismissed.

### 7. *Constitutionality of Va. Code § 19.2-264.2 as applied*

■ Finally, Boggs argues that his death sentence must be overturned because the jury applied Virginia's "vileness" aggravating circumstance, which he argues lacks a constitutional limiting instruction.[2]

Under Virginia Code § 19.2-264.2, a defendant may be sentenced to death either because of his future dangerousness or the vileness of his crime. Vileness means "wantonly vile, horrible or inhuman," and has three disjunctive parts: the murder must have involved torture, depravity of mind, or aggravated battery to the victim. Boggs' sentence was based solely on the "aggravated battery" portion; the jury was not instructed as to the other possibilities.

---

**2.** He also argues that Virginia applies the penalty discriminatorily against killers of whites; the respondent argues that the claim is defaulted, but in any event it lacks merit after the recent decision in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

The Supreme Court has held that aggravating circumstances based in "vileness" are unconstitutionally vague unless the jury is given some limiting instruction that guides their discretion. *Gregg v. Georgia,* 428 U.S. 153, 201, 96 S.Ct. 2909, 2938, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). The Court has recently indicated unanimously that the dicta in those cases would be followed. *See Maynard v. Cartwright,* — U.S. —, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

The issue here is whether the limiting instruction given was constitutionally sufficient. The jury was instructed that they could impose death if they found the murder "wantonly vile, horrible or inhuman" in that it involved an aggravated battery "beyond the minimum necessary to accomplish the act of murder." In *Smith v. Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), the Virginia Supreme Court approved a slightly different version: that the battery was one "which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish the act of murder." The Fourth Circuit approved this version in *Turner v. Bass,* 753 F.2d 342 (4th Cir.1985), *rev'd on other grounds,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).

Boggs first challenges the *Smith/Turner* version, claiming that it inadequately limits the jury's discretion, but obviously *Turner* binds this Court on that claim. Boggs goes on to argue that the difference between the instruction at his trial and the *Smith* instruction is of a constitutional magnitude. When read along with the other "vileness" categories, Boggs argues, it is clear that "aggravated battery" is intended to cover crimes where wounds unnecessary to kill are inflicted out of pure sadism. But the instruction here, by leaving out the notions of "qualitative" excess and "more culpable" battery, fails "to distinguish between cases where additional wounds were inflicted out of sheer cruelty and those (such as the present case) where the additional wounds did [not] reflect an intent to torture or to inflict pain." Petitioner's Cross–Motion for Partial Summary Judgment, p. 27. That is, the instruction is designed to apply to the butchers, not a "nervous, inexperienced killer who botches his crime or performs it with less than surgical precision." *Id.* at 24.

Boggs' argument does make some sense. Premeditated murder is gruesome by its nature. It will almost always involve aggravated battery in a technical sense, and the instruction was undoubtedly designed to capture the vileness of the crime rather than a medical analysis of which injuries actually brought about death. A literal reading of the instruction given at Boggs' trial would impose death on a defendant who fired two shots in rapid succession, one of which happened to kill, but would not impose death on a killer who gave the victim a slow poison that only brought death after hours of suffering. Also, the medical examiner here labeled both the head wounds and the stabbing as the cause of death, so Boggs may not have done more than the minimum necessary.

Even so, the Court dismisses this claim. The instruction, taken as a whole, adequately defines the jury's task even if the last phrase alone does not. The instruction makes clear that the aggravated battery finding is relevant because it should be used to determine whether the murder was vile, horrible, or inhuman. It sufficiently instructs the jury that it should not apply a cold factual analysis about cause of death but instead reach a moral judgment about whether the wounds were excessive in a way that was more culpable than murder generally. Admittedly, neither Virginia nor the Fourth Circuit has approved the precise wording of the limiting instruction as given at Boggs' trial, but it does not differ significantly from the instruction approved in *Turner,* and it satisfies the constitutional requirements set by the Supreme Court.