Richard T. BOGGS, Petitioner–Appellee,

v.

Toni V. BAIR, Warden; Edward W. Murray, Director; Mary Sue Terry, Attorney General, Respondents–Appellants.

Richard T. BOGGS, Petitioner–Appellant,

v.

Toni V. BAIR, Warden; Edward W. Murray, Director; Mary Sue Terry, Attorney General, Respondents–Appellees.

Nos. 88–4010, 88–4012.

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1989.

Decided Dec. 12, 1989.

Rehearing and Rehearing En Banc Denied Jan. 9, 1990.

Robert H. Anderson, III, Asst. Atty. Gen. Richmond, Va. (Mary Sue Terry, Atty. Gen., Stuart, Va., on brief), for respondents-appellants.

Jefferson McClure Gray (Bruce R. Genderson, Williams & Connolly, Washington, D.C., on brief), for petitioner-appellee.

Before WIDENER and SPROUSE, Circuit Judges, and DUPREE, Senior District Judge for the Eastern District of North Carolina, sitting by designation.

WIDENER, Circuit Judge:

This is a case in which Richard T. Boggs was sentenced to death for the capital murder of Mrs. Treeby Shaw, a neighbor of Boggs.

After his conviction and sentence were affirmed on appeal, Boggs sought habeas corpus relief in the state courts, which was denied. He then filed a petition for habeas corpus relief in the federal district court. The district court denied habeas corpus relief so far as the guilt phase of Boggs' trial was concerned, but granted relief as to the penalty phase, thus requiring a new trial as to the penalty.

On appeal the Commonwealth claims that the district court erred in requiring a new sentencing trial in the state court. On cross appeal, Boggs claims that the district court erred in not, at the least, requiring a complete new trial. We agree with that portion of the district court's decision which denies relief as to the guilt of the defendant, but we reverse the decision to require a new trial for sentencing.

At approximately 1:30 a.m. on February 17, 1984, the Portsmouth, Virginia police arrested Richard T. Boggs in connection with a fatal hit-and-run accident in which Boggs had been observed striking a pedestrian with his vehicle. Boggs fled the scene, was chased by a passerby, and forced off the road by a police vehicle. Boggs was subdued after attempting to run from the police. As the officer was trying to gain control of Boggs against the side of Boggs' Volkswagen, Boggs stated: "Hey, man, I didn't do nothing. That nigger jumped off the sidewalk onto the front of my car."

Other officers arrived on the scene to take control of the vehicle. Boggs was administered several sobriety tests, the results of which led to his arrest for hit-and-run as well as for drunk driving. Boggs and his car were then transported to the police station.

At the time of the arrest for hit-and-run, the police notified the detectives who were investigating the murder of Treeby Shaw, another homicide in which Boggs was loosely considered a suspect or someone who should be talked to. An informant had told the police that Boggs had been attempting to sell items of silver similar to those taken from the Shaw home. Boggs was questioned by one of the detectives as to the Shaw homicide and denied having any knowledge thereof.

Subsequent to those first questions by the homicide detectives as to the Shaw killing, an inventory search was conducted of Boggs' impounded vehicle. During the search, a knapsack was found in the trunk which contained items that matched the description of those items stolen in connection with the homicide. Boggs was in-formed at approximately 6:25 a.m. of the items found in his vehicle and that he was now a suspect in connection with the January 25, 1984 murder of Treeby Shaw. After Boggs was given *Miranda* warnings, he signed a written waiver and made a statement in which he admitted the murder and robbery of Mrs. Shaw. He explained that his motive was that he needed the money "to support my habit of drugs." The statement was transcribed and signed by Boggs at 7:10 a.m. His confession contained the following:

I preplanned the murder. I knew you were going to get me. I knocked on her door for a friendly visit to borrow a book. She offered me tea. I drank three cups of tea. I had the murder weapon in my pocket when I walked to the door.

I was in her house from approximately 7:00 to 9:00 Wednesday evening [January 24, 1984].

The murder weapon was a round hunk of steel about 4 inches long and 1 inch in diameter. Well she offered me tea, I sat down and drank tea with her. Man it was hard to kill her. The woman was so nice, so kind to me.

It was about 8:30 I started pounding her in the head with the metal weapon. There was no struggle. She fell on the first blow to the head.

I continually pounded her head with the murder weapon and she didn't die. So I went in the kitchen and got a butcher knife and I repeatedly stabbed her, until I heard no more breathing. Then I searched the house for money.

One of the homicide detectives involved in taking the statement later testified that Boggs became very emotional during the confession by breaking down and crying while describing what he called a "horrible death." During the interrogation, Boggs also stated:

I want to kill the enemy on the other side. Which is me, the white all over the world. I want to kill niggers. I'm a cold blooded killer, [expletive deleted] it.

At a pre-trial hearing, the defense moved to suppress Boggs' confession and to ex-

clude the items seized by the police from his car. Boggs' counsel argued that the search of his vehicle was improper under the Fourth Amendment to the Constitution. Defense counsel reiterated these arguments at trial and further in the Virginia Supreme Court on appeal.

Boggs' counsel also filed a motion on the first day of trial requesting that the court redact the sentence "I want to kill niggers" from his confession before it was read to the jury. This motion was also denied. Defendant was tried before a jury, upon his plea of not guilty, to charges of capital murder and robbery. The jury found him guilty on both charges and fixed his punishment at life imprisonment on the robbery charge.

A separate trial was conducted before the same jury to determine defendant's sentence on the capital murder conviction. During the guilt phase of the trial, Dr. Faruk Presswalla, the Commonwealth's Deputy Chief Medical Examiner for the Tidewater area, had described the nature of the injuries that the autopsy revealed. Presswalla found that Mrs. Shaw died as a result of a combination of blows to the head which injured her brain and a stab wound which penetrated her heart. Dr. Presswalla also testified as to the details of Mrs. Shaw's fatal injuries in the penalty phase of the trial. Further, the Commonwealth introduced photographs of the decedent, the murder weapon and the signed waiver and confession of Boggs.

Boggs called two witnesses other than himself to testify in mitigation. One was his father, who stated that Boggs had shown remorse over the killing and read to the jury a letter written by Boggs after his arrest that expressed such. Another was Dr. E. Daniel Kaye, a psychiatrist who had examined Boggs. Kaye reported that from his examination he had determined that Boggs' capacity to conform his conduct to the requirements of the law was significantly impaired at the time of the murder; but, he also said that Boggs was neither insane nor showed any signs of severe psychiatric disorder.

The jury returned a sentence of death, stating that the defendant's conduct in committing the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved aggravated battery to the victim. The trial court subsequently conducted a sentencing hearing and sentenced Boggs to life imprisonment on the robbery charge and to death by electrocution on the murder charge. His conviction and sentence were affirmed on appeal by the Supreme Court of Virginia. *Boggs v. Commonwealth*, 229 Va. 501, 331 S.E.2d 407 (1985).

Boggs filed a petition to the Supreme Court of the United States for a writ of certiorari to review his conviction and sentence. The petition was denied on February 24, 1986. *Boggs v. Virginia*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 347, *reh'g denied*, 475 U.S. 1133, 106 S.Ct. 1666, 90 L.Ed.2d 207 (1986).

On November 26, 1986, Boggs filed a petition for writ of habeas corpus in state court. He sought relief on eight grounds, all of which were later advanced in his federal habeas corpus petition. The Commonwealth moved to dismiss the petition, which motion was granted on February 24, 1987. Boggs filed an appeal with the Supreme Court of Virginia, which was denied. *Boggs. v. Bair*, Record No. 870593, filed June 5, 1987.

Boggs appealed the dismissal of his petition to the Supreme Court of the United States asking the Court to consider his claims that he had been subjected to an improper warrantless inventory search and that the trial court had erred by refusing to redact the prejudicial portions of his confession. After a request from the court for further briefing on the question of whether the claims were procedurally barred under Virginia law, the petition was denied on April 4, 1988. *Boggs v. Bair*, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988).

Boggs asserts that the application of the vileness factor of the Virginia death penalty statute is unconstitutional as applied in his case. Under Virginia Code § 19.2–264.2, a defendant may be sen-

tenced to death based either on his future dangerousness or on the vileness of his crime. The prosecution in this case sought the death penalty solely on the basis of the vileness predicate. A murder may be considered vile under the statute if the jury finds that it involved torture, depravity of mind, or an aggravated battery to the victim.

■ Boggs argues that the instruction given the jury concerning aggravating circumstances lacks constitutionally required limitations. The Supreme Court has held that aggravating circumstances based on vileness are unconstitutionally vague unless the jury is given some limiting instruction that guides their discretion. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); see *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). More specific guidelines enable the courts to review rationally the sentence imposed. The instruction given by the trial court was that the jury could impose a sentence of death if they found the murder "wantonly vile, horrible or inhuman" in that it involved an aggravated battery "beyond the minimum necessary to accomplish the act of murder." This was, to some extent, self-limiting, for it did not include any statutory vileness factors except that of aggravated battery.

In the case of *Turner v. Bass,* 753 F.2d 342 (4th Cir.1985), *rev'd on other grounds,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), this court held that a similar limiting instruction approved by the Virginia Supreme Court was constitutionally sufficient to limit the jury's discretion in imposing the death penalty under the Virginia statute. The trial court in *Turner* had relied upon the instructions approved in the case of *Smith v. Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979), which stated that aggravated battery is battery "which, qualitatively and quantitatively, is more culpable than the

minimum necessary to accomplish the act of murder." 219 Va. at 478, 248 S.E.2d at 149. We find that the difference in phraseology of the instruction we approved in *Turner* and the instruction found here is not of constitutional magnitude.[1] Nor do the two instructions imply a different meaning or outcome. The trial court properly instructed the jury using constitutionally limited instructions on the vileness factor as required by the Supreme Court. Thus the sentence based on the statute as applied to Boggs is constitutional.

Boggs then argues that his criminal conduct is not that which the vileness provision of the statute seeks to encompass. Rather, Boggs argues that a constitutional interpretation of the aggravated battery predicate should restrict it to crimes where the murderer inflicted wounds that he knew were unnecessary to kill.

Boggs claims that the batteries his actions inflicted were not so severe as to be aggravated battery, for the claim now is that Boggs was trying to find the most expedient way to end Mrs. Shaw's life. He suggests that this case does not involve the type of "horrifying torture-murder" that the Court mentioned in *Gregg* and that such should be the *sine qua non* for death sentences imposed pursuant to vileness aggravating circumstances.

■ We agree with the Virginia Court, however, that the number or nature of the batteries inflicted upon the victim is a proper test as to whether the defendant's conduct was outrageous or wantonly vile, horrible, or inhuman in that it involved an aggravated battery. We reject the argument that the defendant had to know that the initial wounds inflicted were insufficient to cause death or, stated another way, that this was a torture murder. The killing in this case was premeditated. That was not only admitted in Boggs' confession, it is specifically admitted in Boggs' brief in this court at p. 51. That being true, we rely on the finding of the Virginia Supreme Court which follows and adopt that part of its opinion for our finding that the acts com-

---

1. See also *James Briley v. Bass,* 750 F.2d 1238, 1242–46, 1278 (4th Cir.1984), which dealt with an instruction using the same language as that used here.

mitted here by Boggs were, in fact, aggravated battery within the meaning of the Virginia statute.

The defendant's confession and the testimony of the medical examiner show that Mrs. Shaw was struck in the head with a metal bar, not once but six times, and in the neck several times; that she was still alive while Boggs searched for her valuables; that she was stabbed in two places with a long knife which had been partially withdrawn and re-thrust at least three times; and that she did not die until the knife sliced the front wall of her heart. It is difficult to imagine evidence which better satisfies the definition of an aggravated battery.

331 S.E.2d at 421.

Boggs next argues that his Fifth and Fourteenth Amendment rights were violated by the use of his confession against him at his trial, which was obtained, he argues, while he was intoxicated. Of course, the mere fact that one has consumed alcoholic beverages does not mean that he is so intoxicated as to make his confession involuntary. The standard is, was his confession the product of a rational intellect and free will, and is expressed in *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963), as follows:

If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement.

The district court, without making a finding as to whether or not the state courts' findings that Boggs was not so intoxicated were not fairly supported by the record under 28 U.S.C. § 2254(d)(8), decided that since there was admittedly no coercion by the police officers in this case and none claimed, under *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the confession was admissible because of the absence of coercion. While that may be a legitimate way to approach

the subject, we reach the same result more directly and need not adopt that approach.

■ We have read, as contained in the appendix, the entire record of the suppression hearing freely accorded to Boggs in the state circuit court in which he was tried and at which hearing he testified. Other than Boggs' own testimony, there simply was not any evidence at all to support the claim that Boggs was so intoxicated that his confession was not the product of his rational intellect and free will.

Boggs was arrested immediately after he had run down and killed with his car a black pedestrian. This arrest was between 1:00 a.m. and 1:30 a.m. Numerous officers testified as to the degree of his sobriety during the 5½ or 6 hour period between the arrest and his confession. Also testifying as to Boggs' condition as to sobriety was one Penn, a passing motorist who had seen Boggs hit the pedestrian and had chased Boggs until an officer intervened and captured Boggs, who had attempted to flee after stopping his car. The substance of all of the testimony at the suppression hearing, except Boggs', who insisted that he did not remember anything that happened between the time he was arrested and the time he confessed, was that Boggs smelled of alcoholic beverages and his eyes were bloodshot and perhaps glazed, but that he was able to walk without staggering and talk coherently. Of considerable significance is that Boggs had sufficient presence of mind between 3:25 a.m. and 3:55 a.m., in response to an inquiry about the Shaw killing, to make a detailed response, which was completely exculpatory and perfectly rational. For example, Boggs stated the last time he had seen Mrs. Shaw was just before Christmas:

I asked her if she wanted her yard raked, and I raked it for her for $5.00. That was just before Christmas.

Also during that time period, Boggs, in his own handwriting, in response to questioning concerning the hit and run charge concerning the pedestrian Boggs had just hit, made a statement more than a page in length which is not only perfectly intelligi-

ble and legible, it is quite exculpatory. This statement was made at 2:40 a.m.

On this record, the state trial judge denied Boggs' motion to suppress his confession because he was so intoxicated that his will was overborne, an implicit finding of fact that Boggs was not so intoxicated. This finding was explicitly affirmed on appeal by the Virginia Supreme Court at 331 S.E.2d at 415–16. We are of opinion that this factual finding is fully supported by the record and is the kind of finding which is entitled to deference under 28 U.S.C. § 2254(d). While the question of whether or not a confession is voluntary or involuntary is a question for independent federal determination, and at best a mixed question of law and fact which § 2254(d) does not control, subsidiary factual questions, such as the level of intoxication here, are factual questions which come within the statute. See *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). We are thus of opinion that Boggs' confession was not made inadmissible by any degree of intoxication he may have suffered the night in question.[2]

■ Boggs' next argument is that he was not afforded a full and fair opportunity in the state courts to litigate the merits of his claim that his Fourth and Fourteenth

Amendment rights were violated by an unlawful search of his car. In connection with this claim, it should be remembered that Boggs alertly gave exculpatory statements, including one as to the death of Mrs. Shaw, until after the time that the officer discovered Mrs. Shaw's silver in a knapsack in Boggs' car in the course of an inventory search.

*Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), held that Fourth Amendment claims such as this one may not be relitigated in federal habeas corpus if the prisoner has had a full and fair opportunity to litigate the claim in the state courts.

In this case, Boggs' apparent argument is that the case of *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), changed the law on inventory searches to add an additional requirement, coming from the concurring opinion in *Bertine* and the Supreme Court of Florida in the case of *State v. Wells,* No. 69,363 (Fla. Dec. 1, 1988)■ that *Bertine* requires, as a prerequisite for validly opening a closed container, a specific directive to open closed containers as a part of the policy with respect to inventory searches. The argument goes that since *Bertine* was decided following Boggs' trial, and the inquiry in

---

**2.** At 2:10 a.m. the night of his arrest, Boggs was administered a breathalyzer test to determine alcohol content in his blood. The result of that test was that he had .22% alcohol at that time. Boggs did not introduce any testimony with respect to the effect of the blood test at his suppression hearing. Neither did he introduce any evidence with respect to it at his state habeas corpus hearing. In his federal habeas corpus case, however, in the district court, he sought to have a hearing on the degree of his intoxication at the time of his confession and, in support of that, filed an affidavit of a physician stating his opinion as to Boggs' level of intoxication. The affidavit estimated that Boggs' blood alcohol level would have been .145 at the time of his confession between 6:45 a.m. and 7:10 a.m., and that Boggs' mental processes would have been seriously impaired at that time because of alcohol. The Virginia statute, Virginia Code § 18.2–269, provides that with a blood alcohol level of .10 there is a presumption of intoxication, but such has not always been the case, for the statute initially provided that .15 was the level at which intoxication was presumed. See Va. Acts of Assembly, Ch. 757 (1972). The

blood alcohol level of Boggs at the time he confessed would not even have sufficed to invoke the earlier statutory presumption. The district court was of opinion that Boggs could have introduced this in his federal habeas proceeding although he had not done so at trial or in the state habeas case. We do not agree. We think that the affidavit of the physician with respect to Boggs' blood alcohol content was just as available at trial as it was in the federal court and was just as available in the state habeas case as it was in the federal court. Thus, we do not believe that the record with respect to the degree of Boggs' intoxication was subject to such reopening unless the district court found under 28 U.S.C. § 2254(d)(8) that the record did not support the factual determination with respect to intoxication. There must be a stopping point with respect to reopening factual matters in such records and the point has been reached in this case. See *Praylow v. Martin,* 761 F.2d 179, 183 (4th Cir.1985).

Boggs' trial went only to whether there was an inventory policy, not whether it specifically included closed containers, that the subject has to be reexamined.

That argument with respect to the holding of *Bertine*, however, is one we need not address for Boggs was afforded a full and fair opportunity to litigate his Fourth Amendment claim in the Virginia courts. He made a motion to suppress the evidence found in the search of his car on the ground that the search was a sham. This was part of a suppression hearing which takes up more than 130 pages of the appendix. At that hearing all of the various motions of the defendant were argued at length and the testimony of witnesses was offered with respect to such motions by both sides. A more full and fair hearing in the trial court could not have been had. The same applies to the same point when raised on appeal, which is discussed at 331 S.E.2d at 414–15. There the Supreme Court of Virginia discussed the fact that the search conducted was an inventory search and Boggs' claim that the search was a sham. Also discussed in the opinion of the Virginia court was the fact that the particular evidence involved was found in a knapsack, a sealed container. That Court found that the search of a sealed container, pursuant to a legitimate search, was not an unreasonable search under the Fourth Amendment. As with the hearing in the trial court, the treatment of the matter by the Virginia Supreme Court could not have been more fair and candid.

We are thus of opinion that Boggs was afforded every full and fair opportunity to litigate and have adjudicated the Fourth Amendment claim with respect to the search of his vehicle and that he should not be permitted to further relitigate the same under *Stone v. Powell*. *Doleman v. Muncy*, 579 F.2d 1258 (4th Cir.1978).

Because the search of Boggs' car was not unlawful under the Fourth Amendment, it follows that his claim that his confession was a fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in that it came about as a result of a search of the car, is also without merit.

■ Boggs next argues that his Sixth and Fourteenth Amendment rights were violated by the exclusion for cause of members of the venire who expressed personal opposition to the death penalty.

The members of the venire involved were James Brabson, Yvonne Johnkins, and Charlotte Boomer. At this point, it is well to note that, while the court asked a few questions during the voir dire examination of the jurors, it permitted the attorneys to question the members of the venire, and most of the voir dire examination was in response to questions from the attorneys.

Omitting large parts of the examination of each of these three people, the culminating questions in their voir dire examinations, the answers to which are entirely consistent with the balance of their examinations, follow:

Q (to James Brabson): Are there any circumstances which would enable you to vote for the death penalty?

A: None; I am just against it.

Q: You couldn't imagine any sort of circumstances?

A: None at all, I am just plain against it.

Q (to Yvonne Johnkins): Are there circumstances that you could imagine where you could vote for the death penalty? Are there any circumstances at all that would allow you to do that?

A: No.

Q (to Charlotte Boomer): And once again, I am not trying to give you a hard time, but just to sharpen it a little bit, are you telling us, absolutely, you could not vote for the death penalty under any circumstances?

A: Right.

The trial court excused these three jurors for cause and, on appeal, the Virginia Supreme Court affirmed, stating that in its opinion, those jurors were disqualified under *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). While it was

not necessary, the court noted that, in its opinion, they would have been disqualified under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The claim of Boggs is that these jurors were disqualified under *Witt* and *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). *Witt* and *Darden* re-examined the *Witherspoon* holding with respect to jurors sitting in a case involving the death penalty. *Witt* held that the construction sometimes given *Witherspoon* to the effect that to be disqualified, a juror must automatically be unable to apply the death penalty, was improper. Rather, the court held that the proper construction of *Witherspoon* was expressed in *Adams,* and is to the effect

"... that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.*"

*Adams,* 448 U.S. at 45, 100 S.Ct. at 2526, quoted in *Witt,* 469 U.S. at 420, 105 S.Ct. at 850 (emphasis added by the court in *Witt*). The Court also decided that the presumption of correctness under 28 U.S.C. § 2254(d) also applies to a state court's decision on such finding of bias made with respect to jurors. *Witt,* 469 U.S. at 426–30, 105 S.Ct. at 853–55. *Darden,* following *Witt,* repeated that the standard is whether the juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath. 477 U.S. at 177, 106 S.Ct. at 2469. *Darden* also repeated *Witt*'s holding that the trial judge's determination that a potential juror is impermissibly biased is a factual finding entitled to a presumption of correctness under 28 U.S.C. § 2254. 477 U.S.

at 175, 106 S.Ct. at 2468. And so the law remains today.

We are of opinion that the answers given by the jurors to the questions, which we have set forth above, leave no doubt that such views would prevent or substantially impair the performance of their duties as jurors. Thus, we are further of opinion that the holdings of the Virginia courts and the district court, as to disqualification of the three prospective jurors, were correct and are not subject to valid constitutional objection.

■ Boggs' argument continues, however, that the trial judge failed to question those three jurors to determine whether they could put aside their personal beliefs and follow their oaths as jurors and vote for the penalty of death in a proper case. We first note that there is nothing in the record to indicate that these jurors could have so put aside their personal views. Their examinations on voir dire indicate that they could not, and we decline to introduce into the law the rule argued for by Boggs which would say that a trial judge has a constitutional duty to try to rehabilitate by his personal questioning any juror who has been shown to be disqualified, as were the three here. We are thus of opinion that Boggs' claims with respect to the jurors' views on the death penalty are without merit.[3]

■ Boggs' next argument is that the trial court's refusal to sustain challenges for cause to four jurors violated his Sixth and Fourteenth Amendment rights to an impartial jury because of alleged bias in favor of the prosecution.

Each of these four jurors, in initial questioning, did give testimony from which it could be concluded that they had the initial impression that the defendant had the burden of proving his innocence. One of them did state that she had thought death would

---

**3.** Boggs did not make this last argument with respect to examination by the trial judge in his direct appeal, so the Virginia Supreme Court did not consider the matter. He did raise it on his state habeas petition, however, and that court held he was procedurally defaulted. The Commonwealth now claims, probably correctly, see

*Whitley v. Bair,* 802 F.2d 1487, 1496 (4th Cir. 1986), that there has been procedural default, and we should not consider the matter. However correct its position may be, we need not depend on it because there is no merit to the claim in any event, as we have set forth in the text.

ordinarily be the appropriate punishment for capital murder.

As the Virginia Supreme Court pointed out, however, the excerpts from the testimony on which Boggs relies must be considered in isolation to draw the conclusion on which Boggs depends, and as the district court pointed out in its opinion, taken in context, these jurors on voir dire examination expressed more confusion than certainty.

With respect to the burden of proof, each of them testified that they could accept the fact that the defendant did not have to prove anything. Even Boggs admits in his brief that each of them indicated they could follow the court's instructions regarding the presumption of innocence.

With respect to the juror's idea of appropriate punishment for capital murder, she testified that she was thinking of the biblical maxim of "an eye for an eye," and she stated unequivocally that she could vote either for life imprisonment or death, depending on the facts and circumstances of the case and especially that she could vote for life imprisonment if she felt the circumstances indicated it.

In the case of all these jurors, we especially note the absence of any factual bias against the defendant due to publicity, previous knowledge of the case and the like.

The district court found that the testimony clearly supports the standard set forth in *Patton v. Yount,* 467 U.S. 1025, 1036–40, 104 S.Ct. 2885, 2891–93, 81 L.Ed.2d 847 (1984), following a finding by the Virginia Supreme Court that none of the four jurors were any longer unsure which party bore the burden of proof and that the view as to capital punishment of the one of them who referred to the biblical maxim would not prevent or substantially impair the per-formance of her duties as a juror in accordance with the instructions of the court.

We agree with the district court. *Patton* states that the question here is plainly one of historical fact: did the juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality be believed. 467 U.S. at 1036, 104 S.Ct. at 2891. Although the factual question here goes to mistaken impressions of the four jurors involved, the trial court's findings as to the answers to the questions before it depended largely on credibility and demeanor, as is true in most such cases. See *Patton,* 467 U.S. at 1038, 104 S.Ct. at 2892. That being true, and the trial court's resolution of the question being entitled to special deference, the question is whether there is fair support in the record for the state court's conclusions that the jurors would be impartial. *Id.* We are of opinion there is ample support in the record for the conclusion of the state court that all four of these jurors would be impartial. Nothing in the record we have seen detracts from that conclusion.

We are thus of opinion and decide that there was no error in the refusal of the state trial court to sustain the challenges for cause to the jurors just mentioned.

■ The district court treated as error the trial judge's refusal to redact as irrelevant and prejudicial the following two sentences from Boggs' five-page confession: "I want to kill the enemy on the other side, which is me, the white all over the world. I want to kill niggers." [4] *Boggs v. Bair,* 695 F.Supp. 864, 869–70 (E.D.Va.1988). Finding that the evidence of Boggs' guilt was overwhelming, the district court concluded that the admission of the statements in the guilt phase of Boggs' trial was harmless error. *Id.* at 870. As to the sentenc-

---

**4.** At trial Boggs confined his objection to the one phrase "I want to kill niggers," asking only "that one sentence containing those five words be stricken from the statement...." The Commonwealth contends, therefore, that Boggs' challenge to the other sentence, "I want to kill the enemy on the other side, which is me, the white all over the world," is procedurally defaulted. For a variety of reasons, the district court allowed Boggs to challenge the other sentence as well. Because we believe the two sentences are so interrelated that any view of one necessarily applies to the other, and because we conclude that the admission of both sentences was not unconstitutional, we express no opinion concerning the propriety of the district court's procedural ruling, and we address both sentences together.

ing phase, however, the district court found that the inclusion of the two sentences violated the Eighth and Fourteenth Amendments to the Constitution by allowing the jury to impose a death sentence on Boggs based on his racist opinions. *Id.* We address the admission of the unredacted confession in both phases of Boggs' trial together.[5]

The centerpiece of the district court's decision is that the admission of the two sentences set forth above allowed the jury to conclude, and that the prosecutor urged the jury to conclude, that "anyone with such racist views deserved to die...." 695 F.Supp. at 870. We find this view of the case entirely unsupported by the record.

To begin with, the challenged language constituted only three lines in the middle of page three of a five-page confession. Those two sentences, and particularly the phrase "I want to kill niggers," are the only words in the entire confession that even arguably have racist overtones.

Second, in our opinion the prosecutor did not, as the district court found, "argue[ ] that those two sentences ... warranted a verdict of capital murder instead of murder in the first degree" and "urg[e] that anyone with such racist views deserved to die." *Id.* Although the prosecutor did refer to Boggs' statement during his closing argument in both phases of the trial, even reciting the particular language in question, he did not unduly emphasize those two sentences or their possible reflection of racial animus. Rather, in our view the prosecutor merely attempted to point out Boggs' callousness as reflected by several parts of the confession.

As the district court noted, in the guilt phase the prosecutor stated, "[Y]ou ask yourselves, 'What type of individual would say words like this?' ... It's in there, [he] calls them a name; it's in here, and you know what the name is, and he tells you to give him first degree murder, so you won't have to come back [for a sentencing phase]." *Id.* The district court left out, however, that the prosecutor made similar remarks concerning other parts of defendant's statement. For example, the district court omitted from the above quotation that portion in which the prosecutor said, "He tells you he is a cold-blooded killer, and other people he may want to kill." Moreover, the excerpt that the district court quoted covers parts of seven lines in a closing argument that occupies over twelve transcribed pages, all of which was designed, as is any closing argument, to argue the Commonwealth's case for conviction.

Similarly, with reference to the sentencing phase, the district court quoted the prosecutor, and drew its conclusion. The district court described the argument of the prosecutor as follows:

> In the sentencing phase, the prosecutor returned to this theme, urging that anyone with such racist views deserved to die: "he said, 'I want to kill the enemy on the other side'; yet, they will tell you to spare his life.... He goes on to say 'I want to kill niggers'; and he said today it's true; so he's not going to confine himself to any particular people."

695 F.Supp. at 870.

Boggs (as we will detail later) had just testified in the sentencing hearing that the statements in the confession were true. He did not equivocate. What the prosecutor actually said follows:

> He said the statement is true. This is how he feels, and he said, "I want to kill the enemy on the other side"; yet, they will tell you to spare his life. He said "I want to kill the enemy on the other side which is me, the white all over the world." He goes on to say, "I want to kill niggers"; and he said today it's true; so he's not going to confine himself to any particular people.

Appendix 754–55.

So, far from emphasizing any racial aspect of Boggs' confession, as did the dis-

---

5. The attorneys and the trial court were quite conscious of the racial implications and overtones the entire series of events might lead to. The jury was never told about the fact that Boggs had run down and killed a black pedestri-

an only a few hours before he confessed to the killing of Mrs. Shaw. Also Boggs' racial slurs were kept from the jury, except those in his written confession.

trict court, the prosecutor downplayed it by his even-handed treatment of the confession although it included a racial slur.

Given Boggs' statement that "I'm a cold-blooded killer" and his consecutive threats toward whites and blacks, the prosecutor logically concluded, as his comment to the jury indicates, that Boggs was undeserving of sympathy. Once again, the district court's chosen excerpt, and indeed the only excerpt that reveals racial prejudice, covers parts of seven lines in a closing argument that extends some twenty-two pages and involved two prosecutors. In addition to recounting in gory detail the circumstances of Boggs' crime, the brutal murder of an eighty-seven year old woman, one prosecutor emphasized another portion of the confession:

"I'm a cold blooded killer. I cold-cocked her ass." Read that statement again. I urge you to do that. Can you do that. Can you have one ounce of sympathy for this man, after reading a statement like that....

The only fair characterization of Boggs' statement as a whole reveals not merely racial bias, but a cold insensitivity to human life and a willingness to destroy those in his way, black or white.[6] Moreover, in mentioning the threat to both races that the two sentences revealed, the prosecution actually defused the racial character of Boggs' language. In his own words Boggs declared that he preplanned the murder, that he was a cold-blooded killer, and that he, in effect, wanted to kill anyone, black or white, who got in his way. On cross-examination during the sentencing phase of the trial, the prosecutor questioned Boggs concerning his confession:

Q: You heard this statement read by Detective Harvey. That's what you told him, isn't it? Do you want to read the statement? Read that, and make sure that's what you told him. (Defendant reads statement)

A: This is what I told the police.

Q: And is what you told the police true?

A: Yes.

Q: So everything you read in that statement is true; right?

A: Yes.

Appendix 727. Given the callousness, and indeed candidness, of Boggs' statement, and his failure to express any second thoughts about the statement at trial, the jury hardly needed to rely on any latent racial bigotry to impose a death sentence.

After a thorough review of the record, we are convinced that Boggs' racial bias played no meaningful role in either his conviction or his sentencing. Whether or not the trial court's refusal to redact the two phrases was the most appropriate exercise of judicial discretion, we decline to fashion a constitutional rule that requires the exclusion of all racially offensive terms in an otherwise admissible confession.

In case No. 88–4010 in which the district court issued its writ of habeas corpus with

---

**6.** The district court decided that because Boggs stated his desire to kill blacks, the passage appeared relevant to Boggs' future dangerousness. *Boggs v. Bair,* 695 F.Supp. 864, 870–71 (E.D.Va. 1988). The district court then concluded that the two sentences were not relevant, however, because the jury was not instructed with regard to future dangerousness.

These two sentences were certainly evidence which tended to show Boggs' intent to kill. Such intent was relevant both in the guilt as well as in the sentencing phase of the trial. While we are not cognizant of an all-embracing rule for the relevancy of evidence in the sentencing phase of a capital case, we think as good a statement as may be had comes from *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), in which the Court stated that it was "clear that a State cannot take out of the realm of relevant sentencing considerations the questions of the defendant's 'character', 'record,' or the 'circumstances of the offense'— *Lockett* [*v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 1978] does not hold that the State has no role in structuring or giving shape to the jury's consideration of these mitigating factors." 487 U.S. at 173–75, 108 S.Ct. at 2327. While this rule was announced in the context of what a state could not constitutionally remove from the consideration of a sentencer in a capital case, and leaving aside for the moment the questions of "character" and "record," no reason suggests itself to question that the "circumstances of the offense" in this case are not illuminated by the two sentences in question from Boggs' confession. To repeat, they certainly expressed Boggs intent to kill, be the victim black or white. So we adopt a rule that the "circumstances of the offense" is a relevant constitutional sentencing consideration in a case involving vileness.

respect to the sentencing phase of the trial, the judgment of the district court is RE-VERSED.

In case No. 88–4012, in which the district court declined to issue its writ of habeas corpus as to the guilt phase of the trial, the judgment of the district court is AF-FIRMED.