Earl WASHINGTON, Jr.,
Petitioner–Appellant,

v.

Edward W. MURRAY, Director, Virginia Department of Corrections, Charles E. Thompson, Warden, Mecklenburg State Correctional Facility, Respondents–Appellees.

No. 89–4013.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1990.

Decided Dec. 19, 1991.

As Amended Dec. 31, 1991.

---

Eric Freedman, Hofstra University School of Law, Hempstead, N.Y., argued (Robert T. Hall, Hall, Markle, Sickels & Fudala, P.C., Fairfax, Va., Peter Huber, Washington, D.C., on brief), for petitioner-appellant.

Linwood Theodore Wells, Jr., Asst. Atty. Gen., Richmond, Va., argued (Mary Sue Terry, Atty. Gen., on brief), for respondents-appellees.

Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

PHILLIPS, Circuit Judge:

This is an appeal by Earl Washington, a Virginia death-row inmate, from the district court's summary dismissal of his petition for habeas corpus challenging on various constitutional grounds his conviction and death sentence for capital murder following the commission of rape. We find no error in the dismissal except as to one claim of ineffective assistance of counsel respecting the failure to explore and use certain forensic evidence which allegedly was available to counsel and, if used, would have been directly exculpatory. As to that claim, we conclude that the district court erred in not conducting an evidentiary hearing to determine certain facts dispositive of the claim, and we therefore vacate dismissal of that claim and remand for an evidentiary hearing.

### I

In June of 1982, Rebecca Williams lived with her husband and three children in a ground-floor unit of an apartment complex in Culpeper, Virginia. Neighbors found Mrs. Williams collapsed in the doorway of her apartment at approximately noon on June 4, 1982, suffering from multiple stab wounds. She said that she had been raped by an unknown black man acting alone. Mrs. Williams succumbed from her wounds at approximately 2:00 p.m. that day. Mrs.

Williams had been stabbed thirty-eight times and fourteen of these wounds could have caused death. Vaginal smears revealed the presence of sperm which had been deposited one to twelve hours before death.[1]

The investigation into Mrs. Williams' murder failed to result in an arrest for almost a year. Suspicion initially had focussed on one James Pendleton, but he was never arrested. About a year after the murder, Washington was in custody on other charges in another county when he, according to the testimony of police officers, confessed, first orally, then in writing, to murdering and raping Mrs. Williams. Washington was a black man, aged 22 at the time, with a general I.Q. in the range of 69, that of a child in the 10.3 year age group. At trial, Washington denied making the inculpatory statements as testified by the interrogating officers and relied on an alibi—that he was working at home at the time of the crime. The alibi was neither corroborated nor directly refuted by other witnesses.

After his trial and conviction, Washington appealed to the Virginia Supreme Court, which affirmed his conviction and death sentence.[2] *Washington v. Commonwealth*, 228 Va. 535, 323 S.E.2d 577 (1984), *cert.* denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). Following denial of his petition for certiorari by the United States Supreme Court, Washington filed a petition for a writ of habeas corpus in the state circuit court. The Virginia circuit court denied the petition without an evidentiary hearing. Washington filed a petition for appeal in the Virginia Supreme Court which found "no reversible error in the judgment complained of" and refused the petition. Washington then filed his petition for a writ of habeas corpus in the federal district court which granted the Commonwealth's motion to dismiss without holding an evidentiary hearing.

This appeal followed.

---

1. Mr. Williams' testimony excluded him as a source of the sperm.

2. Washington's retained trial counsel was appointed to represent him on direct appeal.

## II

We first address several claims of constitutionally ineffective assistance of trial counsel raised in Washington's § 2254 petition and summarily dismissed by the district court.

■ Because no state court evidentiary hearing had addressed any of these claims, Washington was entitled to an evidentiary hearing in the district court if the factual allegations he made as to any, if proved, would entitle him to relief. *Townsend v. Sain,* 372 U.S. 293, 312–13, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). *See Becton v. Barnett,* 920 F.2d 1190, 1192 (4th Cir.1990). A remand for such an evidentiary hearing is the relief that Washington seeks with respect to these claims.

The issue of ineffectiveness of counsel's assistance is a mixed question of law and fact subject to de novo review in this Court. *Becton,* 920 F.2d at 1192. To prove such a claim, Washington must establish both that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the outcome of the proceeding would have been different but for the deficient performance, a "reasonable probability" being one "sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984).

### A

■ We first consider Washington's claim that his trial counsel had failed to develop and present to the jury the results of certain allegedly exculpatory forensic evidence. Specifically, his petition alleged that his counsel had received but failed to appreciate the significance of, and hence to introduce at trial, the results of exculpatory laboratory tests on semen stains found on a blanket recovered from the bed where the rape of Mrs. Williams occurred.

This allegation was supported by two affidavits. One, by an affiant proffered as an expert in the field, opined that the laboratory reports of the blood type and PGM [3] type of the semen stains, as compared to Washington's, excluded Washington as the depositor of the semen. The other, by his trial counsel (proffered on a motion for reconsideration following dismissal of the petition), stated that counsel had received the laboratory reports but did not recognize their arguably exculpatory nature.

The district court rejected this claim of ineffective assistance without an evidentiary hearing, on alternative grounds: that counsel's conduct, as alleged, did not fall outside the range of acceptable professional conduct, and that in any event there was no reasonable probability that the outcome of the proceeding would have been different but for the challenged conduct. We look at these in turn.

■ If, as Washington alleged, his counsel failed to offer available evidence which in a significant way drew his factual guilt in issue, counsel's performance obviously fell below an objective standard of reasonable professional conduct, unless some cogent tactical or other consideration justified it. The allegation that the evidence was available to counsel was supported by counsel's affidavit (though belatedly filed), and was not disputed by the Commonwealth. The allegation that the laboratory reports indicated Washington's blood type as O with PGM type of 2–1 whereas four samples of the semen stains on the blanket from the crime scene showed blood type A with PGM type of 1, was undisputed. The allegation that this disparity of types indicated that Washington could not have been the depositor of the semen in the stains was supported by the opinion by affidavit of a facially qualified expert that was not disputed by opposing expert opinion or other evidence.[4]

---

**3.** Phosphoglucomutase (PGM) is an enzyme found in the red blood cells. Brian Wraxall, *Forensic Serology, in Scientific and Expert Evidence* 897, 925 (Edward J. Imwinkelried ed., 2d ed. 1981).

**4.** In its brief in this court, the Commonwealth belatedly advances a factual/legal argument that the different PGM types may have resulted from a "masking" of the semen depositor's type by the victim's bodily fluids, thereby undercutting any exculpatory significance in the differ-

On this state of the record, the district court could not properly conclude as a matter of law, without an evidentiary hearing, that counsel's conduct as alleged in Washington's petition fell within the range of reasonable professional conduct. No tactical considerations justifying counsel's failure to proffer the forensic evidence or at least to explore its reliability and exculpatory significance is suggested on the record. Nothing intrinsic in the laboratory reports made them so manifestly unreliable or scientifically irrelevant to the identification issue central to Washington's defense that counsel's failure to use them could be deemed justified on that account without need for further explanation. For all that appeared from the petition's allegations, partially supported by unrebutted affidavits, counsel inexplicably had failed to recognize the significance of, hence to proffer in Washington's defense, facially exculpatory scientific evidence. Unless explained by circumstances not developed on the record, that could not be deemed performance within an objectively reasonable range of professional conduct under the circumstances.

An evidentiary hearing of course might have developed facts sufficiently explaining and justifying counsel's facially inexplicable failure, thereby bringing it within the range of reasonable professional conduct. But without such an explanation or justification, the district court erred in concluding as a matter of law that counsel's conduct as alleged in Washington's petition was within that range.

That error, however, would be of no consequence if the district court correctly concluded that even assuming the truth of the allegations of deficient performance, there was no reasonable probability, given the evidence of Washington's guilt, that the result of the proceeding would have been different had the challenged conduct not occurred, i.e., had the possible significance of the facially exculpatory evidence been recognized, then verified, and the evidence introduced by counsel at trial. This determination requires a judgmental assessment of the reasonable probability that introduction of this forensic evidence would, at the least, have raised a reasonable doubt of Washington's guilt in the jury's mind, *or* have caused the jury to recommend life imprisonment rather than death as the sentence if guilt were found. Here again, we believe the district court could not properly make that assessment without an evidentiary hearing to determine the reliability and scientific significance of the laboratory test reports. Without such a predicate factual determination, the court could only dismiss the claim on the basis that even if the exculpatory quality of the forensic evidence were accepted as alleged in Washington's petition, its probative force was not such as to make it reasonably probable that had it been laid before the jury, it would at the least have created in that body a reasonable doubt as to guilt or resulted in the recommendation of a lesser sentence reflecting that doubt.

We do not believe the court properly could so conclude, notwithstanding the strength of the evidence of guilt presented to the jury. For that evidence, though obviously constitutionally sufficient to convict, was not without its difficulties for any fair-minded jury asked to find guilt of a capital offense. The evidence consisted essentially of a confession obtained by interrogation almost a year after the crime, from a mildly retarded person upon whom suspicion had not earlier focussed during the crime's investigation, and who was not indeed suspected when the critical interrogation which elicited his inculpatory statement was commenced, apparently blindly, while he was in custody in connection with an unrelated crime. The circumstances under which the statements were elicited by police interrogation were such as to raise

ences. The petitioner has sought on appeal to counter this argument with an affidavit disputing its scientific validity.

The "masking" theory was not presented with any supporting evidence in the district court. We cannot properly consider either it or petitioner's counter-argument as a matter of first instance in this court. The opposing contentions on this critical factual matter are properly the subject of the evidentiary hearing we order upon remand.

at least colorable questions of the voluntariness and intelligence with which they were given.[5]

The only physical evidence corroborating Washington's elicited statements was a shirt traced in testimony to the crime scene which, according to the police, was identified by Washington as his when confronted with it during his interrogation a year later. Though facially damning, the circumstances under which this chain of evidence was put together were not without their own special difficulties for a factfinder. In the first place, Washington's admission of ownership was an elicited one in the course of the interrogation whose general difficulties for the factfinder have been earlier noted. Furthermore, the testimony as to the circumstances under which the shirt originally came into possession of the police presented further special problems. Despite an extensive investigative search of the crime scene soon after the crime's commission, the shirt was not found or, if noticed, was not thought significant by any investigator who did see it. Instead it first came into police possession some six weeks after the crime, when the victim's mother-in-law turned it over to investigators. The mother-in-law testified that she had come across the shirt in the drawer of a dresser containing clothes of both the victim and the victim's husband that had been removed from the victim's apartment to the mother-in-law's home a week or more after the crime. The mother-in-law had laundered and dried all the clothes, including the shirt, the day of the dresser's arrival and later, while folding them, asked the victim's husband, her son, whose shirt it was. The son testified that he replied that he did not recognize it, that it did not fit him. The mother-in-law then placed it in her husband's bedroom. On at least one occasion, the husband wore the shirt while draining the oil from his truck, following which he hung it on the doorknob. About four weeks later, the mother-in-law turned the shirt over to investigators. Laboratory tests performed shortly thereafter identified blood in three stains on the shirt, but further identification of types was impossible.

Negroid hairs were found in the pockets of the shirt. Laboratory tests on these demonstrated that they were consistent in part with the facial hairs of the original suspect, James Pendleton.[6] When, upon Washington's later arrest, defense counsel requested comparison with Washington's facial hair, the request was declined.

A police officer testified that during his interrogation of Washington, he asked Washington if he had left anything in the apartment, to which he said Washington

---

5. By this observation, we do not address the merits of petitioner's separate, related claims of constitutional error in the state trial court's refusal to suppress the statements for involuntariness and then in improperly instructing the jury on their probative value. The former claim is addressed on the merits and its dismissal affirmed in Part III–A of this opinion; the latter, in Part III–D.

The point here is the continued relevance, nevertheless, of the circumstances under which the statements were made to the quite different issue of their weight relative to that of the allegedly exculpatory forensic evidence in assessing the prejudice prong of the *Strickland v. Washington* test. As to that, the point is that the circumstances—though not proof of legal involuntariness—yet raise at least colorable questions of the statements' trustworthiness. In brief summary, in addition to the conceded fact of Washington's mild retardation and low I.Q., the habeas record revealed the following items: the statements were elicited by a process of interrogation over a period of two days, and

came as responses to specific questions and suggestions (later reduced to written form), rather than as volunteered narrative; the responses contained numerous original factual errors—including the race of the victim, the injury inflicted, the non-presence of any others at the crime scene (two children were present), and the location of the victim's apartment—all later corrected by further questions and suggestions; and perhaps of special importance, the availability of expert medical opinion (offered at the state habeas proceeding to support a suggestibility attack on the statements) that Washington's psychological state was such that he was highly suggestible, "easily led," that "out of his need to please and his relative incapacity to determine the socially and personally appropriate, he relies on cues given by others and reflexive affability" (Follansbee Affidavit, J.A., Vol. I, pp. 134–35).

6. Whose blood types were also found to be consistent with those in the semen stains found on the blanket at the crime scene. (J.A. Vol. IV, pp. 1003–04, 1006.)

replied, "my shirt." (In the written statement introduced in evidence, the question put was whether Washington had left "any of [his] clothing in the apartment.") According to the police testimony, when the shirt was then retrieved from a police car, shown to Washington, and he was asked if it was his, he answered yes, identifying it by a patch.

Testifying at trial, Washington denied ownership of the shirt and denied having told the police that it was his. His sister testified that she washed all his clothes and that neither Washington nor any of his brothers ever had owned such a shirt.

Our detailed account of the evidence of guilt, including some of the critical circumstances of its acquisition, is not of course undertaken to question its constitutional sufficiency to support a jury finding of guilt. As indicated, it obviously suffices in that respect. The purpose instead is to indicate that though sufficient in that respect, it is not without real, as opposed to merely fanciful, problems for any fairminded jury asked on its basis unanimously to find guilt beyond a reasonable doubt. For our purposes, we need only be able to say of it that, despite its strength, there are in it enough possibilities for fair and rational doubt that directly exculpatory evidence of high probative force probably would have generated enough of real doubt to prevent a finding of guilt. In our judgment, the evidence is subject to at least that degree of potential doubt.

We can say that much about the evidence as a matter of law. What we cannot say, and the district court properly could not say as a matter of law, is whether the evidence allegedly overlooked by trial counsel was in fact directly exculpatory evidence of a sufficiently high probative force probably to generate saving doubt. We can, however, hypothesize the kind and quality of evidence that might well do so. A prime example would be unimpeached eyewitness testimony of an unbiased, credible and informed witness directly corroborating Washington's alibi defense. Scientifically reliable forensic evidence which indirectly corroborated the alibi by negating to a high degree of probability Washington's identity as the rapist is an essentially indistinguishable, if not stronger example. Whether the forensic evidence allegedly available to, but unused by trial counsel here, is, as alleged, of that kind and quality, so that its non-use was sufficiently prejudicial under the *Strickland v. Washington* test, could not properly be determined summarily, but only by an evidentiary hearing not yet provided in any state or federal court.

On such an evidentiary hearing, the petitioner's allegation of the reliability and probative value of this evidence might fail of proof as to either or both of these essentials. The laboratory tests might be flawed in some way; there could be chain of custody problems; the raw data allegedly developed could be shown by credible scientific opinion not to be sufficiently probative on the identification issue, etc. But no such deficiencies were manifest on the record before the district court.

It would appear likely that those underlying factual questions could be resolved in a fairly short and easily managed evidentiary hearing at which the burden of proof would of course be on petitioner. But they are questions going ultimately to factual guilt or innocence, hence life or death, that require resolution by that means rather than by summary disposition on a bare documentary record which leaves them open.

Accordingly, we must vacate that portion of the district court's judgment dismissing this claim of ineffective assistance of counsel, and remand that claim for resolution by an evidentiary hearing. The hearing should address as open questions both the professionally deficient performance and prejudice prongs of the *Strickland v. Washington* test as applied to petitioner's forensic evidence claim, in accordance with this opinion.

### B

We next consider two claims of ineffectiveness of counsel that involve failures to invoke Supreme Court decisions whose holdings it is alleged were critical to Washington's defense.

The first such claim alleges a failure to invoke *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), which, it is contended, made inadmissible a state psychiatrist's testimony as to Washington's mental competency because it was based on an interview not preceded by a *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warning. The district court dismissed this claim on the basis that counsel's failure to invoke *Smith* was not professionally deficient because of *Smith*'s inapplicability to the facts of this case.

We agree. Here, unlike the situation in *Smith*, Washington, through counsel, had requested a mental evaluation by the state psychologist, and, before the psychologist's testimony at the state suppression hearing, had put his mental competency in issue by his own testimony. This made *Smith* inapplicable. *See Buchanan v. Kentucky*, 483 U.S. 402, 422–24, 107 S.Ct. 2906, 2917–18, 97 L.Ed.2d 336 (1987).

The other claim is that counsel's conceded ignorance of *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), prejudiced Washington's defense at the sentencing phase. The contention is that the trial court's failure properly to instruct the jury on the definition of vileness as an aggravating factor in Virginia's capital murder statute, and the Virginia Supreme Court's failure to enforce in review a constitutionally adequate definition of vileness as an aggravating factor violated *Godfrey*. Again we agree with the district court that *Godfrey* would not have had any such saving consequence, so that failure to invoke it was not constitutionally deficient performance. We have now held that the jury instruction at issue here comports with the requirements of *Godfrey*. *See Boggs v. Bair*, 892 F.2d 1193–97 (4th Cir.1989), *cert. denied*, 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990). Therefore an "appropriate tribunal," a properly instructed jury, has made the requisite findings of vileness as an aggravating factor, which obviated any need for the Virginia Supreme Court to make an independent finding in order to comply with

*Godfrey*. *See Cabana v. Bullock*, 474 U.S. 376, 387, 106 S.Ct. 689, 697, 88 L.Ed.2d 704 (1986); *Coleman v. Thompson*, 895 F.2d 139, 146 (4th Cir.1990), *aff'd on other grounds*, —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

## C

Washington's next claim of ineffective assistance of counsel was based on trial counsel's failure to object during the sentencing phase of his trial to the testimony of the victim's mother about the impact of the victim's death on her small children. The contention is that this testimony violated the principle of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which though not adopted at the time of Washington's trial, should have been anticipated by counsel on the basis of Virginia statutory and case law which drew the propriety of such "victim-impact" testimony in issue.

Laying aside the question whether the failure to anticipate *Booth* constituted deficient performance under *Strickland v. Washington*, it cannot be found to have prejudiced Washington in view of still later developments. *Booth* has now been overruled by *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which held that victim-impact evidence of the type here in issue may be introduced at the sentencing phases of capital offense trials without violating constitutional rights. Assuming, therefore, that *Booth* may have been retroactively applicable to Washington's trial, *see Rushing v. Butler*, 868 F.2d 800 (5th Cir.1989), *Payne* would apply on any resentencing that might be ordered because though it is a judicial ruling unfavorable to Washington, its application would not violate his due process rights. *See United States v. Sager*, 743 F.2d 1261, 1263–64 (8th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985); *see also Evans v. Thompson*, 881 F.2d 117 (4th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990). Washington therefore cannot demonstrate any prejudice

flowing from counsel's failure to invoke *Booth.*

### D

■ Another ineffective assistance claim alleged professionally deficient performance in trial counsel's failure to press a number of critical points in his closing arguments to the jury at both the guilt and sentencing phases. The contention is that these failures were so egregious as to have made the trial a fundamentally unfair one.

We agree that counsel's failure to make several points critical to the defense might be thought to constitute professionally deficient performance. For example, counsel failed to bring out the factual inconsistencies between Washington's inculpatory statements and the facts as proven, Washington's alibi defense, his sister's favorable testimony respecting ownership of the shirt, and the lack of any other physical evidence, including fingerprints, linking Washington to the crime scene despite an extensive police investigation soon after the crime. Even if, after indulging the required assumptions of possible tactical explanations, we were to conclude that these particular failures are simply inexplicable, we could not further conclude that had these particular points been argued to the jury, there is a reasonable probability that the outcome, either at the guilt or sentencing phases, would have been changed. *See Strickland v. Washington,* 466 U.S. at 668, 104 S.Ct. at 2052.

### E

■ Washington's final claim with respect to counsel's ineffectiveness concerns the failure adequately to investigate and develop independent psychiatric evidence of Washington's lack of competency to stand trial and to understand and waive his Fifth Amendment rights, and counsel's failure to use evidence of mitigating mental abnormalities at sentencing.

The claim of ineffectiveness for failing further to investigate Washington's competency to stand trial was procedurally defaulted at the state habeas petition level and on appeal from the denial of that petition. Washington has failed to show cause and prejudice for his default of this claim on appeal. This claim was therefore properly dismissed on that basis.

The district court further found that none of these particular claims, including the defaulted claim, had merit, relying upon the state court hearings and competency examinations.[7] Washington argues here that it was error for the district court to rely on these state court proceedings for two reasons. He claims that counsel was ineffective during the suppression hearing on his confession in failing to object to the state psychologist's testimony on Fifth Amendment and Sixth Amendment grounds under *Estelle v. Smith,* 451 U.S. at 454, 101 S.Ct. at 1866. The district court found that *Smith* did not apply and we agree with that ruling, for reasons given in Part II–B.

Washington also contends that the state psychologist employed the incorrect test for determining whether he suffered from organic brain damage. He presented to the district court the opinions of a psychologist and psychiatrist that Washington "almost certainly" suffers from organic brain damage. Washington claims that counsel should have obtained an independent opinion on his mental capacity rather than relying on the opinion of the state psychologist.

We find no error in the district court's determination that trial counsel was not constitutionally ineffective in this respect. The state psychologist's testimony was specific and persuasive that Washington suffered from mild mental retardation but that he was competent to proceed at trial and could understand the warnings mandated by *Miranda.* Both trial counsel and the psychologist were aware of all the evidence bearing on Washington's mental capacity including his school records, and

---

7. Washington was found competent to stand trial after commitment to Central State Hospital for evaluation. He also was found competent to proceed in his state court habeas corpus petition after another examination at Central State Hospital.

Washington fails to show that counsel should have suspected the accuracy of the psychologist's opinion.

Washington's later-obtained experts may disagree with the conclusions of the state psychologist, but this after-the-fact disagreement cannot be taken to demonstrate the critical point that counsel's failure to have suspected the possibility of a basis for expert disagreement was professionally deficient performance.

■■■■ Counsel's duty on the issue of a defendant's mental competency is to make a reasonable investigation. *See Becton v. Barnett*, 920 F.2d at 1192. The district court properly relied on the state court proceedings as demonstrating that counsel did not violate this duty in failing to make further investigations into Washington's mental condition either at the time of trial or at the time he waived his *Miranda* rights.[8]

With respect to the claim that counsel failed to present mitigating mental abnormalities at sentencing, we find no error in the district court's dismissal of that claim. Counsel argued in mitigation the evidence of Washington's low I.Q. and conceded mild retardation. We cannot conclude that more emphasis on these conceded conditions would, to a reasonable probability, have changed the sentence.

### III

We turn now to a number of claims of direct constitutional violations.

### A

■■■ We first consider several claims related to Washington's confession, starting with the claim that its admission was constitutionally invalid because Washington was unable by reason of his mental condition to understand the earlier *Miranda* warnings given him. The state court had found after a suppression hear-

ing that the confession was made after a knowing and voluntary waiver of *Miranda* rights. Specifically, the court found Washington's testimony at the hearing to be intelligent and indicative of an awareness and understanding of the criminal process, and found on the evidence as a whole that Washington had the mental capacity to understand the nature of the rights and waiver of rights that had been explained accurately to him. The state court also found that Washington's capacity was not at the critical times diminished by coercion or improper inducement by promises. Deferring to these findings as presumptively correct and dispositive of this claim, the district court dismissed it. We can find no error in that dismissal.

Although the question of the voluntariness of a confession is a question of law, state court factual findings about the circumstances surrounding a confession are presumed to be correct. *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Boggs v. Bair*, 892 F.2d at 1199; 28 U.S.C. § 2254(d). Washington has failed to show that the presumption should not apply here or that these dispositive findings of fact are clearly erroneous. *See Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). The testimony given at the suppression hearing amply supports the state court findings that notwithstanding Washington's sub-standard mental capacity, he was nevertheless mentally competent to make a knowing and intelligent waiver of his *Miranda* rights before making inculpatory statements.

### B

■■■ Washington also claimed that the police violated his rights under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), by re-initiating interrogation after he had cut it off. This claim was supported in the district court by an affidavit of a psychiatrist that during his

---

**8.** Based on these proceedings, the district court also properly rejected Washington's claim that his execution would violate *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), due to his mental retardation. The facts in the record show that Washington is not retarded to the degree that his execution would violate the Eighth Amendment. *See id.* at 333, 109 S.Ct. at 2954.

examination of Washington, the latter had stated that the police initiated a renewed interrogation. Washington himself has not made this assertion in an affidavit.

This claim was found by the district court to have been procedurally defaulted because it was not raised at trial, on direct appeal, or on appeal from the denial of Washington's state court petition for a writ of habeas corpus.[9] The record supports this determination, as well as the determination that the default was not excused by cause, at least for that related to failure to raise the claim on appeal from denial of his state habeas petition.

Even if Washington could overcome this procedural default, it does not appear that relief could be obtained on this claim. The record seems clear that, as the district court found, Washington never invoked his right to counsel. Thus, there could be no *Edwards* violation. *See Edwards*, 451 U.S. at 484, 101 S.Ct. at 1884. If the claim instead were that Washington invoked his right to remain silent, the record of the state trial and suppression hearing indicates that what Washington told his interrogators was that he did not know anything about the subject on which he was being questioned and that the interrogation stopped for that reason. Such a statement is most susceptible to the interpretation that Washington was declaring his inability through ignorance to participate further in the interrogation, rather than refusing to do so as a matter of right or disinclination. *See United States v. Riggs*, 537 F.2d 1219, 1222 (4th Cir.1976). Even if the statement were interpreted as an invocation of his right to remain silent, he would then have to overcome the presumption of correctness attaching to the state court factual finding that he initiated the renewed interrogation. *See Washington v. Commonwealth*, 323 S.E.2d at 582.

### C

Washington also made a general claim that under a proper totality of circumstances analysis, his confession should have been found involuntary. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). In support, he relied principally upon the affidavit of a psychiatric expert offered at the state habeas proceeding which asserted his extreme suggestibility. Again, this evidence simply tends to emphasize the general problem of mental competence, which was considered and rejected by state court factual findings that, as earlier indicated, could not properly be rejected as clearly erroneous on federal collateral review. Accordingly, the district court did not err in relying on those findings which were dispositive on the general issue of the confession's voluntariness. Washington's final claim related to his confession, alleged plain error in a jury instruction. The trial judge instructed the jury, on defense counsel's request, that if the jurors believed that Washington's confession was coerced, they could give it as much or as little credibility as they deemed appropriate. Washington now contends that the jury should have been instructed that if they found that the confession was coerced they must disregard it. The district court properly held that this claim had been procedurally defaulted at trial, on appeal, and on appeal from the denial of his state petition for a writ of habeas corpus.[10]

Even if we were to reach the merits, we could not find Washington entitled to relief on this claim. We could only do so if we concluded that the instruction itself deprived Washington of due process. *See Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977);

---

9. Washington claims that he raised the claim in his petition of appeal. However, if he raised the claim it was as an ineffective assistance of counsel claim and not as an independent claim as he raises the claim here.

10. In the petition of appeal from the denial of state habeas, Washington argued the claim should be considered as an ineffective assist-ance of counsel claim rather than an independent claim as it is raised here. Counsel on habeas was different than trial counsel. Washington failed to show that either counsel was ineffective in failing to raise this issue. *See Murray v. Carrier*, 477 U.S. 478, 487–89, 106 S.Ct. 2639, 2644–46, 91 L.Ed.2d 397 (1986).

*Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). We simply could not so conclude on the record of trial as a whole.

## IV

We finally address a number of other, unrelated claims of direct constitutional violation.

### A

[17] The first is a claim that the trial court improperly relieved the Commonwealth of the burden of proving malice, one essential element of the offense charged, by a jury instruction that violated *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The district court properly concluded that this claim was defaulted in the appeal from the denial of Washington's petition in state court for a writ of habeas corpus, and that no cause or prejudice was shown. This precluded federal habeas relief. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In any event, any error on this issue would have to be found harmless beyond a reasonable doubt. Because Washington's sole defense was alibi, malice was not actually in dispute, and the evidence of malice on the part of the perpetrator of the crime was of course overwhelming. *See Gaskins v. McKellar,* 916 F.2d 941, 952 (4th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).

### B

 Washington claimed that exculpatory evidence was unconstitutionally withheld from the defense. He asserted that the prosecution knew that the laboratory analysis of the semen stains excluded Washington as the rapist but that the prosecution failed to advise defense counsel of this conclusion in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10

L.Ed.2d 215 (1963). The district court properly dismissed this claim. It was conceded by Washington's trial counsel that the prosecution gave him the raw data in the form of the laboratory reports. In doing so, the prosecution complied with the requirements of *Brady.* We do not understand that case to require more in the way of suggestions or explanations of particular implications of the evidence, or of theories of defense that might be based upon it.

### C

 Washington claimed that he was the victim of prejudicial pretrial publicity in violation of Sixth Amendment rights. In support of an unsuccessful motion for change of venue in the state court,[11] he had offered the affidavit of a professor of political science who opined that the publicity surrounding Washington's case was widespread and prejudicial, and created a reasonable likelihood that he could not receive a fair trial in Culpeper County without extra care which a jury voir dire could not provide.

The district court properly dismissed this claim on the basis of state court findings as to the nature and extent of the publicity as revealed in the evidence. The court found, and there is support for the findings, that though publicity about the brutal murder was inevitably widespread, it was essentially factual and not inflammatory in nature. As to the possibility of special prejudice flowing from publicity about other pending charges against Washington, the record reveals that none of these charges were publicized for four months before the trial.

The record further shows that the state trial court conducted careful individual voir dire examinations with the jurors in the case. Only six of the thirty-nine jurors examined were excused for cause due to having formed opinions on guilt or related causes. *Washington v. Commonwealth,* 323 S.E.2d at 583. The record supports the

11. Washington contended that the Virginia Supreme Court applied the incorrect constitutional standard in affirming the denial of his motion for a change of venue. This Court's role in habeas corpus is not to correct alleged errors in

state court's views of the federal Constitution but to determine whether the petitioner's incarceration violates the federal Constitution. *See Cooper v. North Carolina,* 702 F.2d 481, 484 n. 3 (4th Cir.1983).

district court's conclusion that the publicity here was not of a kind or quantity such that prejudice must be presumed. *See Mu'Min v. Virginia,* — U.S. —, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

### D

■ The remaining claims already have been addressed tangentially in considering the ineffective assistance of counsel claims. These claims are that *Booth v. Maryland* was violated in the sentencing phase of the trial,[12] that the jury instruction on the vileness aggravating factor of the Virginia capital murder statute was not properly defined to the jury, and that the Virginia Supreme Court has not adhered to the definition of vileness.[13] For the reasons earlier discussed in connection with the related ineffective assistance of counsel claims, these claims have no merit and were properly dismissed.

### V

Accordingly, we vacate that portion of the district court's order granting respondent's motion to dismiss Washington's claim that his counsel was ineffective for failing to investigate and present to the jury allegedly exculpatory forensic evidence, and we remand that claim for an evidentiary hearing on the dispositive factual issues that this opinion identifies. We affirm the district court's order in all other respects.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

**12.** This *Booth* claim was defaulted at trial, on direct appeal, at the state habeas level, and on appeal from the denial of the petition for a writ of habeas corpus on the state level. Washington failed to show cause or prejudice for his defaults and relief is barred. *See Wainwright v. Sykes,* 433 U.S. at 72, 97 S.Ct. at 2497.

**13.** In addition, the district court properly found that these independent *Godfrey* claims were pro-

cedurally defaulted because in Washington's petition for appeal from the denial of his state court habeas petition he raised the issue only as an ineffective assistance of counsel claim. He has failed to show cause or prejudice for this default. Therefore, relief as to these direct claims is barred. *See Wainwright v. Sykes,* 433 U.S. at 72, 97 S.Ct. at 2497.